## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| In re: | Case No. 19-52578-CAG |
| Arete Healthcare, LLC, *et al.* [1] | Chapter 11 |
| Debtors. | Jointly Administered |
| Arete Creditors Litigation Trust, Plaintiff | |
| v. | Adv. Case No. 21-5079-CAG |
| TriCounty Family Medical Care Group, LLC d/b/a Tejas Urgent Care, Defendant. | |

### *AMENDED* COMPLAINT TO AVOID AND RECOVER TRANSFERS PURSUANT TO 11 U.S.C. §§ 544, 547, 548, 550 AND TUFTA

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE CRAIG A. GARGOTTA:

COMES NOW the Arete Creditors Litigation Trust ("Plaintiff") by and through its duly appointed counsel, to file this *Amended Complaint to Avoid and recover Transfers Pursuant to 11 U.S.C. §§ 544, 547, 548, 550 and TUFTA* ("Amended Complaint")  against TriCounty Family Medical Care Group, LLC d/b/a Tejas Urgent Care ("Defendant") pursuant to FRCP 15(a)(1)(B), stating the following in support thereof:

### JURISDICTION & VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1331, and 1334.

2.      Venue is proper in this Court pursuant to section 28 U.S.C. §§ 1408, 1409.

---

[1] The Debtors also include The Emergency Clinic of Floresville, LLC ("Floresville") and Schertz-Cibolo Emergency Center, LLC ("Schertz").

3.     Plaintiff commences this proceeding pursuant to Rule 7001(1) of the Federals Rules of Bankruptcy Procedure ("Bankruptcy Rules").

## SUMMARY OF COMPLAINT

4.     Plaintiff seeks to avoid and recover all preferential and fraudulent transfers by Arete Healthcare, LLC ("Arete") within 2 years of filing its Chapter 11 Voluntary Petition for Bankruptcy ("Petition") to the Defendant while insolvent and for the benefit of an insider, under 11 U.S.C. §§ 544, 547, 548, and TUFTA, and recover said transfers pursuant to § 550.

## PROCEDURAL HISTORY

5.     On November 3, 2019, ("Petition Date"), Arete Healthcare, LLC ("Arete"), Floresville, and Schertz ("Debtor" individually or "Debtors" collectively) filed voluntary petitions for Chapter 11 relief under Title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division ("Court") [Dkt. No. 1].

6.     On November 7, 2019, the Court ordered the Debtors' cases to be jointly administered [Dkt. No. 24].

7.     On November 27, 2019, the Office of the United States Trustee filed its *Notice of Appointment of Committee of Unsecured Creditors*, appointing the Committee of Unsecured Creditors ("Committee") [Dkt. No. 64], which was amended on May 19, 2020 [Dkt. No. 247].

8.     On May 28, 2020, the Debtors filed the *Debtors' Second Amended Joint Plan of Reorganization* ("Plan") [Dkt. No. 252] and the *Second Amended Disclosure Statement in Support of Joint Plan of Reorganization* ("Disclosure Statement") [Dkt. No. 251].

9.     On June 15, 2020, the Debtors and the Committee filed a *Joint Motion under Fed. R. Bankr. P. 9019(a) to Approve Compromise and Settlement by and Between the Debtors*

*and the Official Committee of Unsecured Creditors* ("Joint Motion") [Dkt. No. 323], which

included a provision to "allow for all chapter 5 claims to be transferred to a litigation trust

managed by a board selected by the Committee" (Joint Motion, p. 3, ¶ 9).

 10. On July 27, 2020, the Court entered an Order approving the Joint Motion [Dkt.

No. 329].

 11. On July 31, 2020, the Debtor filed a *Notice of Filing Litigation Trust Agreement*

[Dkt. No. 331] in accordance with the Joint Motion, after having filed the Litigation Trust

Agreement with the Court on July 29, 2020.

 12. On August 17, 2020, the Court entered *Findings of Fact, Conclusions of Law*

*and Order Confirming Debtors' Second Amended Joint Plan of Reorganization* ("Confirmation

Order") [Dkt. No. 343]. The Confirmation Order included the Litigation Trust Agreement that

was to be deemed created on the effective date of the Plan. *See* Confirmation Order, Exhibit A,

p. 52, ¶ 1.

 13. The Plan states, "The Debtors hereby preserve the following claims and causes

of action [against] Statuory 'Insiders' – All claims asserted or unasserted, including but not

limited to… claims for any avoidance remedy including fraudulent conveyances under Texas

law, and all claims under chapter 5 of title 11, United States Code, whether, (sic) known or

unknown against… [a]ny transferee of any avoidable transfer whether or not now made subject

to any avoidance action against an Insider." *See* Plan, p. 37.

 14. The Plan defines "Causes of Action" to include "Identified Causes of Action"

which is defined as "causes of action, including Avoidance Actions, identified in Exhibit 6 to

the Disclosure Statement. (Plan, p. 15).

 15. Exhibit 6 of the Disclosure Statement identifies "Claims against all prepetition

creditors of the Debtors or any of them which arise under chapter 5 of title 11, United States Code or State law, including preference actions and fraudulent conveyance claims, including fraudulent conveyance claims at Texas state law." (Disclosure Statement, Exhibit 6, p. 3, ¶ 3).

16.     The Plan further provides (in bold) that "No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan." (Plan, p. 37, 38; Section 4.13 "Preservation of Causes of Action").

17.     On August 31, 2020, ("Effective Date") the Plan became effective [Dkt. No. 352].

18.     On June 28, 2021, Plaintiff commenced this adversary proceeding by filing its *Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. § 547 and 550* ("Complaint") [Adv. Doc. 1].[2]

## FACTS

19.     Defendant is a Texas Limited Liability Company with its principal place of business located at 7550 IH-10 West Rd., Ste. 504 in San Antonio, Texas.

20.     Defendant was owned and controlled by individuals Brian Johnson and Joel Kay.

21.     Brian Johnson is the sole owner of WM Medical Consultants, LLC ("WM Medical").

22.     WM Medical owns 50% of the equity interest in Arete (*See* Dkt. No. 77, p. 62,

---

[2] In this document, references to documents on the docket of the lead case shall be indicated as "Dkt. No.," and references to documents on the adversary docket will be referenced "Adv. Doc."

"Statement of Financial Affairs," Part 13, Question 28), 44.25% of the equity interest in Floresville (*See* Floresville Dkt. No. 11, p. 55, "Statement of Financial Affairs," Part 13, Question 28), and 27.635% of the equity interest in Schertz (*See* Schertz Dkt. No. 13, p. 56, "Statement of Financial Affairs," Part 13, Question 28).

23.    Joel Kay is the sole owner of Amajon Healthcare Solutions, LLC ("Amajon").

24.    Amajon owns 50% of the equity interest in Arete (*See* Dkt. No. 77, p. 62, "Statement of Financial Affairs," Part 13, Question 28), 44.25% of the equity interest in Floresville (*See* Floresville Dkt. No. 11, p. 55, "Statement of Financial Affairs," Part 13, Question 28), and 27.635% of the equity interest in Schertz (*See* Schertz Dkt. No. 13, p. 56, "Statement of Financial Affairs," Part 13, Question 28).

25.    The Bankruptcy Code defines "insider" to include affiliates. 11 U.S.C. §101(31)(E). The Bankruptcy Code defines "affiliate" as "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11. U.S.C. 101(2)(A). The Defendant is owned by an entity (Brian Johnson) that indirectly owns (through WM Medical Consultants, LLC) more than 20 percent of the outstanding securities of all three of the Debtors (50% of Arete, 44.25% of Floresville, and 27.635% of Schertz). Therefore, Defendant is an insider of the Debtors.

26.    On November 19, 2014, Defendant and Arete entered into a Management Agreement ("Management Agreement") whereby the Defendant provided business management services, ancillary personnel, employee recruitment and supervision, pricing, marketing, selection of vendors, information systems, clinic assessment and management

services, and risk management, among other services. The Management Agreement is attached to this Amended Complaint as Exhibit A.

27.     Defendant is a creditor as the term is defined under 11 U.S.C. § 101(10)(A) for being an entity that has a "claim" as defined by 11 U.S.C. § 101(5)(A) and (B), against the Debtor that arose at the time of or before the order of relief concerning the Debtor owing to the Management Agreement between the Defendant and Arete.

28.     During the two years prior to the Petition Date, between November 3, 2017 and November 3, 2019, the Debtors continued to operate their business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, ACH transfers, direct deposits, or otherwise, to certain entities.

29.     Between approximately November 6, 2017, and September 19, 2019, Arete paid approximately $115,528.69 to various vendors for or on behalf of the Defendant for the Defendant's expenses ("Payments"). Plaintiff is also informed and believes that over $200,000 in payroll payments were made for the benefit of the Defendant to the Defendant's employees during the same period. A table of payments and dates made by Arete to or for the benefit of the Defendant is attached to this Amended Complaint as Exhibit B. Plaintiff retains its right to amend the complaint and add further detailed allegations regarding individual payroll transfers, as those details later become available to the Plaintiff.

30.     The expenses for which the Payments were made for the benefit of the Defendant and had no direct or indirect benefit to Arete.

31.     On August 9 and 23 of 2021, Arete made transfers directly to the Defendant in the amounts of $18,400 and $800 respectively, totaling $19,400 ("90-Day Transfers"). (Dkt. No. 77, "Exhibit to SOFA Part 3/Ques. #3," p. 60).

32.     The Payments that were made during the one-year period prior to the Petition Date, from November 3, 2018 to November 3, 2019 ("Preference Period") amount to $55,076.88 ("Preference Payments"). *See* Exhibit B.

33.     The total value of property transferred to or for the benefit of the Defendant by Arete during the Preference Period amounts to $77,476.88 ("Transfers").

34.     Plaintiff may learn through discovery or otherwise of additional transfers made to or on behalf of Defendant during the Preference Period. It is Plaintiff's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property to or for the benefit of Defendant or any other transferee. As such, Plaintiff reserves the right to amend this Complaint to reflect: (i) additional information regarding the Transfer(s), (ii) additional transfers, (iii) modifications of and/or revisions to Defendant's/Defendants' name(s), (iv) the inclusion of additional defendants, and/or (v) the inclusion of additional causes of action *(including but not limited to,* 11 U.S.C. §§ 541, 544, 545, 547, 548, 549, 550, 551 and 553) (collectively, the "Amendments"), that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for any such Amendments to relate back to this Amended Complaint.

35.     Plaintiff brings this claim against the Defendant based on reasonable due diligence and investigating into the circumstances of the case and taking into account the Defendant's reasonably knowable affirmative defenses under 11 U.S.C. § 547(c).

36.     Plaintiff acknowledges that some of the Transfers might be subject to defenses under Bankruptcy Code section 547(c), for which Defendant bears the burden of proof under Section 547(g).

## CLAIMS FOR RELIEF

## COUNT I

### (Avoidance of Preference Period Transfers - 11 U.S.C. § 547)

37.     Plaintiff repeats, realleges and incorporates by reference all of the allegations in the preceding paragraphs as if fully set forth herein.

38.     Debtor made one or more Transfers to or for the benefit of Defendant during the Preference Period totaling approximately $77,476.88 or such other amount as may be shown according to proof at trial.

39.     Plaintiff is informed and believes, and alleges thereon, that the Transfers made by Debtors constitute transfers of an interest of the Debtors in property.

40.     Plaintiff is informed and believes, and alleges thereon, that each of the Transfers was made on account of an antecedent debt owing to the Management Agreement between Arete and the Defendant.

41.     Plaintiff is informed and believes, and alleges thereon, that Defendant was a creditor of the Debtor at the time each of the Transfers was made by virtue of the antecedent debts Debtor owed to Defendant at that time.

42.     Plaintiff is informed and believes, and alleges thereon, that each of the Transfers was made while the Debtor was insolvent.

43.     Plaintiff is informed and believes, and alleges thereon, that each of the Transfers occurred on or within the Preference Period.

44.     Plaintiff is informed and believes, and alleges thereon, that the Transfers enabled Defendant to receive more than it would have if the Bankruptcy Case was filed as a Chapter 7 bankruptcy case, the Transfers had not been made, and the Defendant received payment to the extent of a Chapter 7 creditor as provided under the Bankruptcy Code.

45.     Each Transfer was to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because each Transfer either reduced or fully satisfied a debt or debts then owed by the Debtors to the Defendant.

46.     In accordance with the foregoing, each Transfer is avoidable by the Plaintiff pursuant to 11 U.S.C. § 547(b).

## COUNT II

**(Avoidance of Fraudulent Transfers and Obligations – 11 U.S.C. §§ 544, 548 and TUFTA)**

47.     Plaintiff repeats, realleges and incorporates by reference all of the allegations in the preceding paragraphs as if fully set forth herein.

48.     Plaintiff is informed and believes, and alleges thereon, that the Payments described in Paragraph 25 constitute transfers of interests in property of the Debtors worth $115,528.69 for which they received less than a reasonably equivalent value in exchange, and that such transfer was made for the benefit of an insider.

49.     Plaintiff is informed and believes, and alleges thereon, that the Debtors were (i) insolvent on the dates the Payments were made, (ii) were engaged in a business or transaction, or were about to engage in a business or transaction, for which any property remaining with the Debtors was unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

50.     To the extent that the Defendant claims that it was not a bona fide creditor of Arete, Plaintiff brings this action under 548 for Fraudulent Conveyance for the same transfers and that each of the Payments constitutes an avoidable fraudulent transfer within the meaning of 11 U.S.C. § 548 and TUFTA §24.005.

## COUNT III

**(Recovery of Avoidable Transfers - 11 U.S.C. § 550)**

51.     Plaintiff repeats, realleges and incorporates by reference all of the allegations in the preceding paragraphs as if fully set forth herein.

52.     Plaintiff is informed and believes, and alleges thereon, that Defendant was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit the Transfers were made.

53.     Plaintiff is further informed and believes, and alleges thereon in accordance with Count I and II above, that the Payments and Transfers are avoidable under 11 U.S.C. § 544, 547 or 548.

54.     Plaintiff is further informed and believes, and alleges thereon, that, to the extent that Defendant is not the initial transferee of any of the Payments or 90-Day Transfers, Defendant is the entity for whose benefit each of the Payments or 90-Day Transfers was made or is the immediate or mediate transferee of the initial transferee of the Transfers.

55.     Plaintiff is further informed and believes, and alleges thereon, that, to the extent that Defendant is the immediate or mediate transferee of the initial transferee of the Transfers, Defendant did not take such transfers for value and/or in good faith and/or without knowledge of the voidability of such transfers.

56.     Pursuant to 11 U.S.C. § 550(a), the Plaintiff is entitled to recover from the Defendant the Transfers, plus interest thereon to the date of payment, and the costs of this action.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff requests that this Court grant the following relief against Defendant:

a.      Avoiding the Transfers described above under 11 U.S.C. §§ 544, 547 and 548;

b.      Granting judgment in favor of the Plaintiff against the Defendant in an amount of

$134,928.69, or in such other amount as may be shown according to proof at trial;

      c.      Requiring the Defendant to immediately pay the amount of the Payments and 90-Day Transfers as stated in the preceding paragraph or in such other amount as may be shown according to proof at trial to the Plaintiff pursuant to 11 U.S.C. § 550(a);

      d.      Awarding pre-judgment and post-judgment interest at the maximum legal rate running from the Petition Date, until the repayment amount ordered by this Court, together with all interest and costs, is paid in full;

      e.      Awarding Plaintiff all of its costs and expenses in bringing this lawsuit;

      f.      Granting the Plaintiff such other and further relief as the Court may deem just and proper.

Respectfully Submitted this 4th day of October, 2021.

*/s/ Daren Brinkman*
Daren R. Brinkman (03004490)
Brinkman Law Group, PC
543 Country Club Drive, Suite B
Wood Ranch, CA 93065
Tel. (818) 597-2992
Fax (818) 597-2998
firm@brinkmanlaw.com

*Counsel for the*
*Arete Creditors Litigation Trust*

# EXHIBIT A

## MANAGEMENT AGREEMENT

This MANAGEMENT AGREEMENT (the "Agreement") is made and entered into as of the 19 th day of March , 2014 ("Effective Date"), by and between TriCounty Family Medical Care Group, LLC ("Management Company"), a Texas Limited Liability Company and Arete Urgent Care, PLLC ("Clinic"), a Texas Professional Limited Liability Company.

### WITNESSETH:

WHEREAS, CLINIC is about to engage in the business of providing urgent care clinic services ("Business") out of the 1,831 square feet of leased space located at 311 East Milam St., Mexia, Texas 76667 ("Facility");

WHEREAS, MANAGEMENT COMPANY is engaged in the business of developing, consulting, managing, and providing equipment, support services and support staff to urgent care clinics;

WHEREAS, CLINIC has requested that MANAGEMENT COMPANY lease medical equipment and assist it in the ongoing consulting, management and operation of the CLINIC; and

WHEREAS, MANAGEMENT COMPANY desires to provide certain services to CLINIC pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, terms and conditions set forth below, the parties agree as follows:

### ARTICLE 1

### ENGAGEMENT AND AUTHORITY

1.1. Engagement. CLINIC engages MANAGEMENT COMPANY to perform the functions and to provide the services described in this Agreement, and MANAGEMENT COMPANY accepts the engagement under the terms and conditions set forth in this Agreement. MANAGEMENT COMPANY shall not have any authority, responsibilities or duties except as provided herein.

1.2. Independent Relationship. CLINIC and MANAGEMENT COMPANY intend to act and perform as independent contractors, and the provisions of this Agreement are not intended to create any partnership, joint venture, agency, or employment relationship between the parties. Notwithstanding the authority granted to MANAGEMENT COMPANY herein, and subject to terms and conditions of this Agreement, MANAGEMENT COMPANY and CLINIC agree that CLINIC shall retain all authority to direct the medical, professional, billing, and electronic medical record documentation aspects of CLINIC's Business. Each party shall be

solely responsible for and shall comply with all state and federal laws pertaining to employment taxes, income withholding, unemployment compensation contributions, benefits and other employment related statutes applicable to that party.

### ARTICLE 2

### MANAGEMENT COMPANY SERVICES

2.1. <u>Business Management Services</u>. MANAGEMENT COMPANY shall use its good faith efforts to provide or arrange for the provision of the services set forth in this Article 2. MANAGEMENT COMPANY is hereby expressly authorized to perform its services hereunder in whatever manner it deems reasonably appropriate. The MANAGEMENT COMPANY shall serve as the exclusive management company for CLINIC's Business at the Facility.

(a) <u>Contract Negotiation/Management.</u> MANAGEMENT COMPANY shall assist the CLINIC to solicit, evaluate, review and negotiate agreements for and on behalf of CLINIC with various vendors. All such agreements shall be subject to the final approval of both the MANAGEMENT COMPANY and the CLINIC.

(b) <u>Operations Manager.</u> The Operations Manager for the Business shall be hired and retained in the position so long as he or she is mutually approved by the CLINIC and the MANAGEMENT COMPANY. The Operations Manager shall work as needed on-site at the CLINIC and shall be responsible for the following facets of administration of the business of the CLINIC:

i. Day-to-day operation of the CLINIC;

ii. Marketing of the CLINIC to other Clinics, physicians and the public;

iii. Public relations of the CLINIC with patients, staff physicians and the community;

iv. Liaison in communicating policies of the CLINIC between MANAGEMENT COMPANY and the CLINIC on the one hand and CLINIC staff and staff physicians on the other;

v. Staffing and scheduling for CLINIC;

vi. Effective utilization of the Facility;

vii. Attending management meetings; and

viii. Implementation of policies of the CLINIC and MANAGEMENT COMPANY.

The cost of the Operations Manager's salary and benefits shall be paid by MANAGEMENT COMPANY on a monthly basis.

2.2. <u>Ancillary Personnel.</u> MANAGEMENT COMPANY shall provide ancillary personnel to staff the clinic appropriately to ensure efficient processing of patients. MANAGEMENT COMPANY shall pay all costs associated with persons employed by the MANAGEMENT COMPANY, including compensation and benefits, regardless of whether such persons are employees, leased employees or independent contractors of MANAGEMENT COMPANY. "Management Staff" shall mean the personnel, either employees or independent contractors, hired, employed or retained by MANAGEMENT COMPANY.

2.3. <u>Employee Recruitment and Supervision.</u> MANAGEMENT COMPANY shall hire and supervise Management Staff for provision of necessary clinical, clerical, accounting, bookkeeping, computer services, medical transcription services and any other ordinary, necessary or appropriate services for the operation of the Business. If MANAGEMENT COMPANY engages an employee-leasing firm such as ADP or Administaff, CLINIC may assist such company in hiring, evaluation, and supervision of those persons working for it at the Facility to the same extent as if they were CLINIC's employees.

2.4. <u>Pricing.</u> MANAGEMENT COMPANY shall  prepare, coordinate, develop and implement pricing strategies for the professional and technical services to be provided by CLINIC, including but not limited to (i) fee for service, (ii) capitation, and (iii) other risk sharing. Pricing shall be subject to final approval by CLINIC and the MANAGEMENT COMPANY.

2.5. <u>Marketing.</u> MANAGEMENT COMPANY shall assist CLINIC with the development and implementation of marketing strategies for CLINIC. All such marketing strategies shall be subject to the approval of CLINIC and the MANAGEMENT COMPANY.

2.6. <u>Selection of Vendors.</u> In the event that services outside of the scope of this Section are required for the management or operation of CLINIC, MANAGEMENT COMPANY shall assist the CLINIC to locate and engage qualified vendors.

2.7. <u>Information Systems.</u> MANAGEMENT COMPANY shall provide the CLINIC access to necessary information systems, including systems necessary for the operation of its patient data base and outcomes oriented patient information system. In addition, MANAGEMENT COMPANY shall periodically evaluate such information systems and provide recommendations for improvements, including hardware and software modification, as appropriate.

2.8. <u>CLINIC Assessment and Management Services.</u> MANAGEMENT COMPANY shall assist the CLINIC to develop systems to track revenues, expenses, utilization, quality improvement, CLINIC and professional providers, and patient satisfaction. MANAGEMENT COMPANY shall arrange for or provide business and financial management consultation and advice reasonably requested by CLINIC and directly related to the operations of CLINIC pursuant to this Agreement.

2.9. <u>Risk Management.</u> MANAGEMENT COMPANY shall participate in ongoing risk management by obtaining and maintaining liability insurance coverage on MANAGEMENT COMPANY and by assuring that it and the Management Staff are insurable, and by participating in an ongoing risk management program. CLINIC shall, and shall cause its employees to, use their respective good faith efforts to exercise diligence in controlling costs and expenses of CLINIC and MANAGEMENT COMPANY without sacrificing professional standards or high quality patient care.

2.10. <u>Additional Services.</u> MANAGEMENT COMPANY shall provide such other services as may be agreed upon from time to time by MANAGEMENT COMPANY and CLINIC by written amendment to this Agreement, signed by both parties.

2.11. <u>Reliance.</u> MANAGEMENT COMPANY shall be entitled to rely upon formal written action taken by CLINIC as reflected and recorded in the minutes of meetings of CLINIC's Manager (as defined below) or upon written instructions received from a person designated by such Manager to give such instructions. "Manager" shall mean the manager as set forth and designated in the company agreement of the CLINIC.

## ARTICLE 3

### DUTIES OF CLINIC

CLINIC shall provide the services set forth in this Agreement which shall include the performance of the following functions on its own behalf:

3.1. <u>Coordination with MANAGEMENT COMPANY</u>. CLINIC agrees to do the following:

(a) Provide MANAGEMENT COMPANY with access to all financial information of CLINIC's Business, including, without limitation, all expense information of the Business at the Facility.

(b) Establish and operate the Business at the Facility pursuant to the Annual Operating Budget.

(i) "Annual Operating Budget" shall mean the budget for the Facility as prepared by the Manager and approved by both the CLINIC and the MANAGEMENT COMPANY setting forth the projected revenue and expenses for the Facility for the coming fiscal year and establishing reserves and capital improvements to be established and made during such fiscal year. The first Annual Operating Budget shall be prepared by the Manager and approved by the CLINIC and the MANAGEMENT COMPANY within thirty (30) days prior to the commencement of operations. Thereafter, annual Operating Budgets shall be prepared by the Manager by August 1 for the review of the CLINIC and MANAGEMENT

COMPANY and approved by both the CLINIC and the MANAGEMENT COMPANY on or before September 30th of each year.

(ii)    "CPI" shall mean the Consumer Price Index, San Antonio Metropolitan Area, published by the Department of Labor of the United States Government.

(c)    CLINIC shall hire, or contract with, train and bill for professional service of one or more Professional Provider. "Professional Provider" means any individual: (a) who is (1) duly licensed to practice medicine and (2) an employee or independent contractor of CLINIC, or (b) who (1) is required by contract, law or regulatory authority to be employed by or whose services are required to be billed through a licensed physician for purposes of obtaining payment or reimbursement for such services or otherwise and (2) provides medical services to patients of CLINIC, including, without limitation, nurse practitioners, physician assistants, fellows, physician assistants, and any other similar individuals providing independent services outside the CLINIC'S services.

(d)    Work with MANAGEMENT COMPANY assuring that CLINIC and its Professional Providers are insurable, and by participating in an on-going risk management program.

(e)    Shall, and shall cause its Professional Providers to use their respective good faith efforts to exercise diligence in controlling costs and expenses of CLINIC without sacrificing professional standards or high quality patient care. CLINIC shall, and shall require its Professional Providers to, exercise due care to ensure that, when being used by Professional Providers, medical equipment utilized at the Facility is being used in a safe and efficient manner, and shall timely report any unsafe or unsatisfactory equipment of which CLINIC, or any of its Professional Providers, is aware.

3.2.    <u>Promotion.</u> CLINIC shall, with the assistance of MANAGEMENT COMPANY, undertake promotional activities on behalf of the Business to ensure the continuity and growth of CLINIC's business.

3.3.    <u>Professional Liability Insurance.</u>  CLINIC shall obtain and maintain professional liability insurance coverage on Professional Providers of the CLINIC that provide professional services for the CLINIC.

3.4.    <u>Licenses and Permits.</u>  CLINIC hereby represents and warrants that it has (or will obtain prior to Facility opening for business) and will maintain for the entire time this Agreement is in effect all licenses and permits required by law to operate the Business and to perform services for patients.

3.5.    CLINIC Operations. During the term of this Agreement, the CLINIC hereby agrees not to take the following actions without the prior written approval of the MANAGEMENT COMPANY:

(i)    Change, amend or modify any lease agreement involving the Facility, or waive any rights of the CLINIC with respect thereto, or grant any consent or approval thereunder, or sell all or any portion of the CLINIC's interest in any lease agreement related to the Facility;

(ii)    Sell, transfer, lease or otherwise dispose of (directly or indirectly), or agree to sell, transfer, lease or otherwise dispose of (directly or indirectly) all or substantially all of the assets of the Facility;

(iii)    Sell, transfer, lease or otherwise dispose of (directly or indirectly), or agree to sell, transfer, lease or otherwise dispose of (directly or indirectly) any equipment in the Facility;

(iv Make leasehold improvements to the property of the Facility in excess of $20,000 (which shall be adjusted to the CPI, as defined below), whether such improvements are financed out of cash flow or from borrowings;

(v)    Bring, defend, settle, compromise, or otherwise participate in any actions, proceedings, or investigations, whether at law, in equity, or before any governmental authority or agency, and whether brought against the Clinic or the MANAGEMENT COMPANY, arising out of, connected with, or related to the Facility in which the aggregate amount at issue exceeds $25,000 (which shall be adjusted to the CPI); and

(vi)    Cause the CLINIC to guarantee the obligations of another Person in which the aggregate amount at issue exceeds $75,000 (which shall be adjusted to the CPI).

## ARTICLE 4

### COMPENSATION

4.1.    Management Fee. To compensate MANAGEMENT COMPANY for the provision of services pursuant to the terms and conditions of this Agreement, CLINIC agrees to pay to MANAGEMENT COMPANY a management/service fee (the "Quarterly Fee") defined below, each fiscal quarter in the following manner:

(a)    The Quarterly Fee shall be due five (5) days after MANAGEMENT COMPANY has provided the Quarterly Report to CLINIC. In the event such funds are not available, MANAGEMENT COMPANY agrees to provide the CLINIC with a grace period

not to exceed ninety (90) days. Any outstanding balances greater than thirty (30) days will be subject to an annualized interest rate 1% of the unpaid balance.

(b)     The Quarterly Fee will be calculated as follows: the Operating Expenses of the Business will be deducted from the CLINIC's total gross revenue earned from the Business at the Facility (the "Gross Less Operating Amount") and thereafter an additional two and a half percent (2.5%) of the Gross Less Operating Amount will be subtracted from the Gross Less Operating Amount and kept by CLINIC for future Operating Expenses. The remaining amount will be the Quarterly Fee.

(c)     Operating Expenses are all expenses incurred by the CLINIC for operation of the Business at the Facility, including, but not limited to: billing; administrative and ancillary staffing salaries and benefits, if any; payment for contract professional providers or other contract labor; electronic medical records; the commercial lease obligation on the Facility; insurance premiums; legal and professional fees.

## ARTICLE 5

### AFFILIATES AND LIABILITY

5.1.     Affiliates. Any contract between the Facility and the CLINIC and/or the MANAGEMENT COMPANY or an Affiliate (as defined below) of either the CLINIC or the MANAGEMENT COMPANY with respect to any matter shall be approved in advance and in writing by both the CLINIC and the MANAGEMENT COMPANY, and any fees and terms under any such contract shall be at market rates and the other terms shall be in all respects reasonable and fair to the Facility in relation to the fees and terms available in the San Antonio, Texas metropolitan area from independent third parties competing to provide substantially the same quality and quantity of such materials and/or services. "Affiliate" shall mean any of the following Persons (as defined below): (i) any Person directly or indirectly controlling, controlled by, or under common control with the Person in question, (ii) any Person owing any interest in the Person in question; (iii) any officer, director, employee, member, shareholder, or partner of the Person in question, and (v) if the Person in question, or any member, partner or shareholder of the Person in question, is an officer, director, member, shareholder, or partner, any company for which such Person in question or any member, shareholder or partner of the Person acts in any such capacity. "Person" shall mean any individual or Entity (as defined below). "Entity" shall mean a general partnership, a limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation, or any other legal or commercial entity.

5.2. Liability. The parties hereto agree that the parties shall look to the assets of the other party for the enforcement of any claim against such party, as none of the trustees, officers, managers, employees, members, partners, agents and/or shareholders of each party assume any liability for obligations entered into by or on behalf of the parties hereto.

ARTICLE 6

TERM AND TERMINATION

6.1. Term. The initial term of this Agreement shall commence on the Effective Date and expire five (5) years subsequent to the Effective Date (the "Initial Term") or until Terminated for Cause under terms of this Agreement. Following the expiration of the Initial Term, this Agreement (subject to earlier termination as set forth below) shall be automatically renewed for successive five year periods (each a "Renewal Term" and, together with the Initial Term, the "Term") unless, at least forty five (45) days prior to the expiration of the Initial Term or the then current Renewal Term, either party provides the other with written notice of such party's intention not to renew this Agreement, in which case this Agreement shall terminate as of the end of the Initial Term or the then current Renewal Term, as the case may be. If this Agreement is renewed, the terms of this Agreement during such Renewal Term shall be the same as the terms in effect immediately prior to such renewal, subject to any such changes or modifications as mutually may be agreed between the parties as evidenced in a written instrument signed by both the CLINIC and the MANAGEMENT COMPANY.

6.2. Termination Without Cause. This Agreement shall not be terminated prior to the end of its stated term without cause or the mutual consent of both parties.

6.3. Termination by MANAGEMENT COMPANY for Cause. MANAGEMENT COMPANY may terminate this Agreement for "cause" at any time if

(a) CLINIC files a voluntary petition in bankruptcy or makes an assignment for benefit of creditors, or other action is taken or suffered by CLINIC, voluntarily or involuntarily, under federal or state law for the benefit of creditors of CLINIC, except for the filing of a petition for involuntary bankruptcy against CLINIC which is dismissed within sixty (60) days after its filing;

(b) CLINIC fails substantially to comply with the material terms of this Agreement and such non-compliance remains uncured (and CLINIC has not commenced compliance) for a period of sixty (60) days following receipt of written notice from MANAGEMENT COMPANY specifying such substantial non-compliance in reasonable detail.

6.4. Termination by CLINIC for Cause. CLINIC may terminate this Agreement at any time for "cause" if:

(a) MANAGEMENT COMPANY files a voluntary petition in bankruptcy or makes an assignment for benefit of creditors, or other action is taken or suffered by MANAGEMENT COMPANY, voluntarily or involuntarily, under federal or state law for the benefit of creditors of MANAGEMENT COMPANY, except for the filing of a petition for involuntary bankruptcy against MANAGEMENT COMPANY which is dismissed within thirty (30) days after its filing;

(b)    MANAGEMENT COMPANY fails substantially to comply with the material terms of this Agreement and such non-compliance remains uncured (and MANAGEMENT COMPANY has not commenced compliance) for a period of thirty (30) days following receipt of written notice from CLINIC specifying such substantial non-compliance in reasonable detail.

6.5.  Effective Date of Termination.  Termination pursuant to Section 6.3 or 6.4 of this Agreement shall be effective thirty (30) days following receipt of written notice by the non-terminating party.

6.6.  Rights and Remedies Upon Termination.  MANAGEMENT COMPANY shall be entitled to receive all fees and expenses due for services rendered by MANAGEMENT COMPANY through the Effective Date of Termination with payment to be made as provided herein and, except for liability for damages proximately caused by a party's breach, neither party shall have any further liability to the other under this Agreement. The provisions of this Section and of Articles 5, 7, 8, 10, and 12 shall survive the termination of this Agreement notwithstanding the provisions of the previous sentence.

ARTICLE 7

CONFIDENTIALITY

7.1. Confidentiality of Patient Records.  All patients' records are the property of CLINIC, but will be available to MANAGEMENT COMPANY for purposes associated with the performance of its duties pursuant to this Agreement.  MANAGEMENT COMPANY shall comply with applicable state and federal laws and regulations regarding confidentiality of patient records.

ARTICLE 8

INDEMNIFICATION AND INSURANCE

8.1. Indemnification.  CLINIC shall protect, indemnify, and save MANAGEMENT COMPANY and the directors, officers, shareholders, managers, members, agents, employees and each of the owners of MANAGEMENT COMPANY harmless from and against any and all liability and expenses of any kind, arising from injuries or damages to persons or property in connection with the operation of the Facility, unless such liability resulted from the negligence or bad faith or willful misconduct of MANAGEMENT COMPANY or from the breaches of this Agreement by MANAGEMENT COMPANY.  MANAGEMENT COMPANY shall protect, indemnify, and save CLINIC, its directors, officers, shareholders, managers, members, agents, employees and each of its owners harmless from and against any and all liability and expenses of any kind, arising from injuries or damages to persons or property in connection with the operation of the Facility to the extent caused by the negligence or bad faith or willful misconduct of MANAGEMENT COMPANY in providing services under this Agreement or by the breaches of this Agreement by MANAGEMENT COMPANY.

8.2.  Insurance Maintained by CLINIC.  During the term of this Agreement, CLINIC shall obtain and maintain comprehensive professional liability insurance on each of the professional providers in the minimum amount of One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) annual aggregate. Subject to the provisions of Section 8.1, above, CLINIC shall be responsible for all liabilities in excess of the limits of such policies. CLINIC's obligation to maintain such professional liability insurance coverage shall survive the expiration or termination of this Agreement for any reason so as to cover any and all professional liability claims or causes of action arising or claimed to have arisen out of the performance of medical services by CLINIC and its professional providers, employees or agents during the term of this Agreement. CLINIC will be responsible for all costs associated with tail coverage after the termination of this agreement.  CLINIC shall also obtain and maintain throughout the entire term of this Agreement, workers' compensation insurance coverage on CLINIC and each of its employees and agents in the amounts required by law.  In addition, CLINIC shall obtain and maintain throughout the term of this Agreement comprehensive general liability and property insurance covering the Facility and CLINIC's operations.  CLINIC shall provide to MANAGEMENT COMPANY a certificate of insurance evidencing all such insurance coverages. The MANAGEMENT COMPANY will be named as an additional insured on all such insurance coverages.

8.3.  Insurance Maintained by MANAGEMENT COMPANY.  During the term of this Agreement, MANAGEMENT COMPANY shall provide and maintain at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) annual aggregate of comprehensive general commercial liability insurance covering MANAGEMENT COMPANY's activities hereunder. MANAGEMENT COMPANY shall also maintain Workers' Compensation insurance coverage for its employees.  MANAGEMENT COMPANY shall provide to CLINIC a certificate of insurance evidencing all such insurance coverages.

ARTICLE 9

NO REFERRALS REQUIRED

9.1. It is not a purpose of this Agreement to induce the referral of patients. The parties acknowledge that there is no requirement under this Agreement or any other agreement between MANAGEMENT COMPANY and CLINIC that any patients be referred to CLINIC or MANAGEMENT COMPANY for services. Additionally, no payment under this Agreement is in return for the referral of patients, if any, or in return for purchasing, leasing or ordering services from CLINIC or its affiliates. The parties may refer patients to CLINIC or any person providing services and will make any such referrals, if any, consistent with professional judgment and the needs and wishes of the individual patient.

ARTICLE 10

DISPUTE RESOLUTION, ORGANIZATION, CONVERSION

10.1.   Dispute Resolution.

(a)   Dispute.  As used in this Agreement, "Dispute" shall mean any dispute or disagreement between the MANAGEMENT COMPANY (and/or its Affiliate(s)) and CLINIC (and/or its Affiliate(s)) concerning the interpretation of this Agreement, the validity of this Agreement, any breach or alleged breach by any party under this Agreement or any other matter relating in any way to this Agreement, the Facility and/or the business/operations of the Facility.

(b)   Process.  If a Dispute arises, the parties shall follow the procedures specified in Sections 10.1(c) and (d) of this Agreement.

(c)   Negotiations.  The parties shall promptly attempt to resolve any Dispute by negotiations between disputing parties.  Either disputing party may give the other party written notice of any Dispute not resolved in the normal course of business.  The disputing parties shall meet at a mutually acceptable time and place within ten (10) calendar days of delivery of such notice, and thereafter as often as may reasonably be deemed necessary to exchange relevant information and to attempt to resolve the Dispute.  If the Dispute has not been resolved within thirty (30) calendar days of the disputing party's notice, or if the parties fail to meet within such ten (10) calendar days, either disputing party may initiate mediation as provided in Section 10.1(d) of this Agreement.  If a party's representative intends to be accompanied at a meeting by legal counsel, the other party shall be given at least three (3) business days' notice of such intention and may also be accompanied by legal counsel.

(d)   Mediation.  If a Dispute is not resolved by negotiations pursuant to Section 10.1(c) of this Agreement, the disputing parties shall attempt in good faith to resolve any such Dispute by non-binding mediation in Bexar County, Texas.  Either disputing party may initiate a non-binding mediation proceeding by a request in writing to the other party (the "Request"), and both parties will then be obligated to engage in mediation.  The proceeding will be conducted in accordance with the then-current Center for Public Resources ("CPR") model procedure for mediation of business disputes with the following exceptions:

(i)   If the parties have not agreed within thirty (30) calendar days of the Request on the selection of a mediator willing to serve, CPR, upon the Request of either disputing party, shall appoint a member of the CPR Panels of Neutrals as the mediator; and

(ii)   Efforts to reach a settlement will continue until the conclusion of the proceedings, which shall be deemed to occur upon the earliest date that:  (a) a written settlement is reached; (b) the mediator concludes and informs the parties in writing that further efforts would not be useful; (c) the disputing parties agree in writing that an impasse has been reached; or (d) the period of sixty (60) calendar days has passed since the Request and none of the events specified in

Section 10.1(d)(ii)(a), (b) or (c) have occurred. No party may withdraw before the conclusion of the proceeding.

(e)     Provision Remedies.  At any time during the procedures specified in Sections 10.1(c) and (d) of this Agreement, a party may seek a preliminary injunction or other provisional judicial relief if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo.  Despite such action, the parties will continue to participate in good faith in the procedures specified in Sections 10.1(c) and (d) of the Agreement.

(f)     Tolling Statute of Limitations.  All applicable statutes of limitations and defenses based upon the passage of time shall be tolled when the procedures specified in Sections 10.1(c) and (d) of this Agreement are pending.  The parties will take such action, if any, as is required to effectuate such tolling.

(g)     Performance to Continue.  Each party is required to continue to perform obligations under this Agreement pending final resolution of any Dispute.

(h)     Extension of Deadlines.  All deadlines specified in this Section 10.1 of this Agreement may be extended by mutual agreement between the disputing parties.

(i)     Enforcement.  The parties regard the obligations in this Section 10.1 of this Agreement to constitute an essential provision of this Agreement and one that is legally binding on them.  In case of a violation of the obligations in this Section 10.1 of this Agreement by either disputing party, a party may bring an action to seek enforcement of such obligations in any state or federal court with proper jurisdiction in Bexar County, Texas.

(j)     Costs.  The parties shall pay (i) their own costs, fees, and expenses incurred in connection with the application of the provisions of this Section 10.1 and (ii) fifty percent (50%) of the fees and expenses of CPR and the mediator in connection with the application provisions of this Section 10.1.

(k)     Replacement.  If CPR is no longer in business or is unable or refuses or declines to act or to continue to act under Sections 10.1(c)-(e) of this Agreement for any reason, then the functions specified in Sections 10.1(c)-(e) of this Agreement to be performed by CPR shall be borne by another person engaged in a business equivalent to that conducted by CPR as is agreed to by Majority Consent (the "Replacement").  In the absence of Majority Consent within ten (10) calendar days after the request, the Replacement shall be selected by the Chief Judge of the United States District Court for the Southern District of Texas upon application.  If a Replacement is selected by either means, this Section 10.1 shall be deemed appropriately amended to refer to such Replacement.

---

**Section 10.2. REPRESENTATION. THE PARTIES AND THE PARTIES' MEMBERS AND MANAGERS ACKNOWLEDGE AND AGREE THAT EACH PARTY HAS BEEN ADVISED TO SEEK ADVICE OF INDEPENDENT LEGAL COUNSEL AND HAS HAD THE OPPORTUNITY TO DO SO.**

---

## ARTICLE 11

### REPORTING

11.1. Reporting.

     (a)    Quarterly Reports. Within seven (7) days after the close of each fiscal quarter of the Facility, CLINIC shall provide to MANAGEMENT COMPANY an unaudited balance sheet of the Business at the Facility for the prior fiscal quarter and the MANAGEMENT COMPANY will provide to CLINIC an itemized calculation of the Management Fee for the prior fiscal quarter.

     (b)    Annual Reports. Within sixty (60) days after the close of each fiscal year of the Facility and CLINIC, CLINIC shall provide to MANAGEMENT COMPANY an unaudited balance sheet of the Business at the Facility for the prior year.

11.2. Other Information. The parties shall provide one another with any other information or reports related to the Business at the Facility that the requesting party reasonably requests.

## ARTICLE 12

### MISCELLANEOUS PROVISIONS

12.1. Notice. All notices, approvals or other communications required to be given by either party to the other under the terms of this Agreement shall be in writing and shall be deemed to have been given if delivered personally, if sent by facsimile with transmission confirmed, if sent by overnight courier that provides confirmation of delivery or mailed, postage prepaid, by registered or certified mail, and addressed to the parties at the addresses below:

If to MANAGEMENT COMPANY:

TriCounty Family Medical Care Group, LLC
1085 Janet Drive
Canyon Lake, Texas 78133
Attn: Managing Member Facsimile:

If to CLINIC:

Arete Urgent Care, PLLC
132 Crane Crest
New Braunfels, Texas 78130

Attn: Managing Member Facsimile:

     12.2.  Entire Agreement.  This Agreement constitutes the entire agreement of the parties with respect to the Business at the Facility, and supersedes all previous and contemporaneous oral and written negotiation, commitments, writings and understandings.

     12.3.  Amendment.  This Agreement shall not be amended, altered, or modified except by an instrument in writing and signed by MANAGEMENT COMPANY and CLINIC.  For the purposes of this paragraph, "writing" shall not include electronic mail and "signed" shall not include an electronic signature.

     12.4.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the state of Texas, without giving effect to the principles of conflicts of laws. Venue shall be Bexar County, Texas.  It is understood by the parties and hereby stipulated that this provision as to governing law and venue is fair to both parties.  The prevailing party in any litigation shall be entitled to recovery the costs of such litigation and reasonable attorneys' fees from the nonprevailing party.

     12.5.  Captions.  The captions or headings in this Agreement are made for convenience and general reference only and shall not be construed to describe, define or limit the scope or intent of the provisions of this Agreement.

     12.6.  Counterparts.  This Agreement may be executed in counterparts, all of which taken together shall constitute the same agreement.  This Agreement, and any other agreements, instruments, documents or writings entered into in connection herewith may be executed by facsimile or portable document format (pdf), each of which shall be deemed an original for all purposes.

     12.7.  Waiver. Failure of any party at any time to require strict performance of any provision of this Agreement shall not be considered to be a waiver of any breach, or of any succeeding breach, of such provision by any party.

     12.8.  Severability.  The provisions of this Agreement shall be deemed severable and if any portion shall be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

     12.9.  Binding Effect.  This Agreement shall be binding on and shall inure to the benefit of the parties hereto, and their successors and permitted assigns. Subject to the foregoing sentence, no person not a party hereto shall have any right under or by virtue of this Agreement.

[EXECUTION PAGE TO FOLLOW]

EXECUTION PAGE TO MANAGEMENT AGREEMENT BETWEEN

ARETE URGENT CARE, PLLC AND TRICOUNTY FAMILY MEDICAL CARE GROUP, LLC.

IN WITNESS WHEREOF, this Agreement has been executed by MANAGEMENT COMPANY and CLINIC effective as of the Effective Date.

CLINIC:
Arete Urgent Care, PLLC
_____,
A Texas Professional Limited Liability Company

By: _____
Name: Brian Johnson
Title: Manager

By: _____
Name: Joel Kay
Title: Manager

MANAGEMENT COMPANY:

TriCounty Family Medical Care Group, LLC,
A Texas Limited Liability Company

By: _____
Name: Brian Johnson
Title: Manager

By: _____
Name: Joel Kay
Title: Manager

FIRST AMENDMENTS
TO THE COMPANY AGREEMENT OF
TRICOUNTY FAMILY MEDICAL CARE GROUP, LLC

September 19, 2014

The Members and Managers of the TriCounty Family Medical Care Group, LLC (the "Company") hereby agree the Company Agreement dated September 3, 2014, (the "Agreement") will be amended as follows:

    A.    Article Six

*Additional Provisions to Article Six:*

**Section 6.04**

    (8)    shall take notes and after each meeting of the Members, draft minutes and provide a copy to each Member, whether or not the Member attended the meeting. A copy of the meeting minutes shall be held at the Company's principal place of business.

    B.    Article Three

*Additional Provisions to Article Three*

**3.**    **16(a)**  The Company may purchase and maintain life insurance or "key person" policies on the Members which are designed to alleviate the financial burden on the Company if an event triggering coverage under the policy occurs. The Company must purchase this type of policy on all or none of the Members.

    C.    Article Four

*Additional Provisions to and Deletions from Article Four*

**4.03**    is DELETED in its entirety and replaced with the following provisions.

**4.03**    Issuance of Membership Interests

After the initial issuance of Membership Units, a unanimous approval of the Members is required for the Company to issue additional Membership Units. This is the only provision in the Company Agreement and these First Amendments requiring a unanimous vote of the members for approval of a corporate act, unless such approval is required by applicable Texas law.

**4.**    **10(b)(1)**  The Non-Member Spouse agrees to waive his or her community property interest, if any, in the Member's Membership Interest and all benefits thereof, regardless of whether the membership interest was purchased with community property assets. The Non-member spouse's consent to this provision is evidenced by the non-member spouse's signature obtained pursuant to Article 4.10(f).

**4.10(c)**    is DELETED in its entirety.

**4.21**    is DELETED in its entirety and replaced with the following provisions:

**4.21**    Sale or Transfer of Membership Interests

(a)     Validity. The Secretary shall ensure that the requirements of Section 4.20 have been met before the sale or transfer of any Units. Sale and transfer of Units shall be valid only on the membership interest transfer books of the Company subject to the requirements of Section 4.20. Transfer shall be only at the written request of the holder of record of such Units, or by his or her legal representatives who shall furnish proper evidence of authority to transfer, or by his or her attorney so authorized by power of attorney duly executed for such Units.

The person in whose name Units stand on the books of the Company, shall be deemed to be the owner thereof as regards the Company. If an assignment for collateral security of Units is made pursuant to the First Amendments, written notice thereof shall be given to the Managers, and the fact that such Units are held for collateral security, and not absolutely, shall be stated on all certificates and records related to the assignment.

(b)     Prohibition on Assignment for Collateral Security.  A Member shall not assign the Member's interest in Units to a third party as collateral security, unless otherwise permitted in the Agreement and any amendments thereof. A Member may assign the Member's interest in a Member's Units to Brian Johnson, individually and/or Joel Kay, individually, to secure a promissory note made by the Member to Mr. Johnson and/or Mr. Kay in exchange for monies used by the Member to finance the Member's purchase of Membership Units.

(c)     Right of First Refusal. If a Member should desire to dispose of any of his or her Units in the Company the Member will first offer, in writing, to sell all of the Units to the Company at a price and by a procedure determined in accordance with the provisions of Section 4.21(f) and its subparts. Any Units not purchased by the Company within forty-five (45) days after receipt of the offer in writing will be offered at the same price to the other Member or Members who will have the right to purchase all or any portion of the Units offered for sale. If more than one of the remaining Members agrees to purchase the Units, then unless those Members who desire to purchase the Units agree otherwise, the Units will be purchased pro rata on the basis of the number of the units owned by each of those Members who desire to purchase the units. A Member who is not a Manager may not own more than 25,000 Units.

(d)     Death of a Member. On the Purchase Date established in the First Amendments, on the happening of the death of a Member, the Company will purchase and the Member or the estate of the deceased Member will sell to the Company at the Purchase Price set forth in 4.21(d)(iii)(a) all of the Units in the Company legally or beneficially owned by the Member or by his or her estate at the time of the Member's death.

(i)     To assure the Company the benefit of this provision, neither the Member nor the Member's heirs, executors, or administrators will sell, exchange, give, transfer, pledge, hypothecate, or otherwise dispose of any interest in the Company or except as provided in this Agreement.

(ii)     After the death of a Member and before the Purchase Date, the Member whose interest is being sold or the Member's estate will deliver to the Company the certificates for the membership interest. The certificate of membership interest delivered to the Company will be accompanied by an assignment and power of attorney in blank or properly endorsed for transfer. On receipt of the Units, assignment, and power of attorney, the Company will pay the Member or the Member's estate the price set forth in 4.21(d)(iii)(a). Thereafter, the Company may cause the purchased Units to be retired.

(iii)     Terms of Payment on Death of Member. If a Member dies, the terms of payment will be as follows: If the proceeds of any life insurance policy on the life of the deceased Member owned by the Company are equal to or exceed the Purchase Price of the Units of the deceased Member, the Purchase Price will be paid in cash on the Purchase Date. If the proceeds of any life insurance are less than the Purchase Price, the total proceeds from the insurance on the deceased Member's life will be paid on the Purchase Date to the deceased Member's estate, plus any additional amount of cash as will be required to make the payment to the deceased Member's estate equal to at least one fifth of the Purchase Price, and the balance of the Purchase Price will be paid in twenty-four (24) equal monthly installments beginning one year after the date of the first payment. The obligation to pay will be evidenced by the Company's promissory note providing for the payment of the balance in twenty-four (24) equal monthly installments commencing one year from the Purchase Date bearing interest at the rate determined pursuant to Section E.1 of the First Amendments on the unpaid balance. The obligation to pay will be personally guaranteed by the surviving Member or

Members. The Company will have the right to prepay any promissory note, in whole or in part, at any time without penalty. The Purchase price of the Units purchased from the Member or Member's estate will be determined according to the terms below.

(a) Purchase Price. The purchase price to be paid for the interest of a deceased Member, which is required to be determined pursuant to this Article, will be calculated as follows:

(1) If the Company has made more than ten (10) distributions to the Member, the Purchase Price will be the average of the last ten (10) distributions to the Member times three and a half (3.5).

(2) If the Company has made less than ten (10) distributions to the Member, the Purchase Price will be the average of the distributions to the Member, times three and a half (3.5).

(3) In no event, however, is the value of a deceased Member's interest to be less than the amount of insurance, if any, on the deceased Member's life owned by the Company for the specific purpose of purchasing a deceased Member's interest.

(iv) The Purchase Date for the Units of a deceased Member will be the earlier of ninety (90) days after the death of the Member or five (5) days after any proceeds from any life insurance policy on the life of the deceased Member owned by the Company are received by the Company.

(e) Divorce of a Member. If, despite the provisions of the Agreement and any amendments thereof, a nonmember ex-spouse is judicially determined to own a community property interest in a Member's Membership Units, after the dissolution of the marriage with the Member, the membership interest shall not vest in the non-member exspouse. The Company will purchase the interest from the non-member ex-spouse according to the terms below.

(i) The Fair Value of the interest awarded to the non-member-ex-spouse, determined by Article

4.21(f)(iv) will be paid over a period of years, evidenced by Company's promissory note providing for the payment of the Fair Value in five (5) equal annual installments commencing one year from the date of delivery of the membership interest certificates to the Company and bearing interest, from the date of delivery, at the rate determined pursuant to Section E.1 of the First Amendments on the unpaid balance. Payment of the note will be personally guaranteed by the remaining Member or Members. The Company will have the right to prepay any promissory note, in whole or in part, at any time without penalty.

(f) Member's Offer to Sell Units. The terms of payment by the Company for any Units offered by the offering Member pursuant to Article 4 will be as follows:

(i) Terms of payment by the Company will be payable at the price set forth in Article 4.21(f)(iv) on the following terms: twenty percent (20%) of the Fair Value of the Units will be payable in cash on delivery of the Membership Unit certificates to the Company (the Withdrawal Date), and the balance will be payable in sixty equal monthly installments commencing one year from the Withdrawal Date.

(ii) Should any Member or Members exercise an option to purchase, the purchase price of the Units will be the Fair Value determined by Article 4.21(f)(iv) and will be paid on the following terms: twenty percent (20%) of the Fair Value will be payable in cash thirty (30) days after delivery of the membership interest certificates to the purchaser and the balance will be payable in sixty (60) equal monthly installments commencing one year from the date of delivery of the Membership Unit certificates to the purchaser.

(iii) The portion of any purchase price not paid in cash will be evidenced by the promissory note(s) of the purchasing Company, Member, or Members, bearing interest at the rate determined pursuant to Section E.1 of the First Amendments on the unpaid balance. If the Company is purchasing

the Units, the promissory note will be personally guaranteed by the remaining Member or Members. If a Member or Members are purchasing the Units, the promissory note will be personally guaranteed by the purchasing Member or Members only. The purchasing Company, Member, or Members will have the right to prepay the note or notes, in whole or in part, at any time without penalty.

(iv) Fair Value. The purchase price to be paid for the interest of a Member or non-member ex-spouse, which is required to be determined pursuant to this paragraph, will be calculated as follows:

(1) If the Company has made more than ten (10) distributions to the Member, the Fair Value will be the average of the last ten (10) distributions to the Member times one and a half (1.5).

(2) If the Company has made less than ten (10) distributions to the Member, the Fair Value will be the average of the distributions received by the Member, times one and a half (1.5).

(g) Consolidation of Debts. On the purchase by the Company of Units from a Member, Member's estate or a non-member ex-spouse in accordance with Article 4 of the First Amendments, the Company will also be required to and will proceed as follows with respect to any indebtedness of the Company to the Member:

(i) As to all indebtedness to the Member, whether or not evidenced by promissory notes or other evidence of indebtedness of the Company, the Company will deliver to the Member or a deceased Member's estate (and at that time any outstanding promissory notes or other evidences of indebtedness of the Company to the Member will be canceled) its nonnegotiable promissory note in the principal amount equal to the indebtedness, including any accrued interest.

(ii) Each promissory note issued and delivered by the Company pursuant to Article 4 at a time when there is an outstanding debt of the Company that requires subordination will contain a subordination clause in the form required by the terms of any agreement with the Company's creditors.

D. Article Five

*Additional Provisions to and Deletions from Article Five*

**5.03 (4)(b)** is DELETED in its entirety and replaced with:

**5.03(4)(b) Forfeiture.**

Upon such forfeiture, the Member shall be entitled to payment as under Article 4.21(f)(iv) of the Agreement and amendments thereof, but shall receive only one-half (1/2) of the Fair Value of his or her membership interest;

**5.07** is DELETED in its entirety and replaced with the following:

**5.07 Distributions**

Distributions may consist, in whole or in part, of cash, promissory notes, or other property, as the Managers may determine is in the best interest of the Company. No Member, regardless of the nature of the Member's contribution, may demand and receive a distribution from the Company in any form other than cash, unless authorized by a majority of the Managers of the Company.

**5.07 (a) Allocation of Distributions**

Each Member shall be entitled to a percentage of any distributions in proportion to the percentage of issued Units in the Company owned by each Member, or in accordance with the special allocations for the Member, as set out in the membership Register and amended from time to time.

### 5.07(b)        Time and Method of Distributions

Distributions, if any, will be made on a bi-annual basis, following a meeting of the Members, no later than fourteen (14) days after the close of the second and fourth quarters of the fiscal year.

Distributions will be made by check and mailed to the address provided by the Member.

### 5.07(c)        Calculation of Distributions

(i)        The Managers will determine the amount of each distribution, if any, in the following manner: The Operating Expenses of the Company will be deducted from the Management Fee paid to the Company by Arete pursuant to the management agreement between the parties.  Thereafter, a Capital Reserve of twenty-five percent (25%) will deducted and held for future Operating Expenses of the Company.  The remaining amount will then be distributed to all of the Members in proportion to each Member's percentage membership interest of the issued membership units in Company.  Each Capital Reserve will be distributed to the Members in the subsequent distribution, in proportion to each Member's percentage membership interest of the issued membership units in Company subject to the terms and conditions of Article 5.

(a) "Operating Expenses" shall mean the foreseeable and unforeseeable expenses of the Company, including but not limited to:  management, administrative and ancillary staff salaries and benefits, medical supplies, office supplies, advertising, equipment purchase and maintenance, administrative costs, insurance premiums, administrative expenses, legal fees and professional fees.

(ii)        Capital Reserve.  If the Capital Reserve is more than thirty-five percent (35%) less than the average of the last five (5) Capital Reserve amounts ("Capital Reserve Average"), then the Managers, at their discretion, may choose to delay the distribution of a portion of the Capital Reserve of the last Distribution in an amount equal to the difference of the Capital Reserve Average minus the Capital Reserve of the present distribution to make the Capital Reserve held by the Company equal to the Capital Reserve Average, or less.

### 5.07(d)        Interim Distributions

Before the winding up of the Company, a Member is not entitled to receive, and may not demand, a distribution from the Company until a distribution is declared to each member of the Company, or to a class or group of Members that includes the Member.  A majority vote of the Managers is required to declare an interim distribution. If the declaration does not contain a different record date, only the Members listed in the Company records on the date of the declaration shall be entitled to any such distribution.

### 5.07(e)        Distributions on Withdrawal

Any Member who validly exercises the right to withdraw from the Company as granted under the Agreement, is entitled to receive the Fair Value, as determined by the procedure set forth in Article 4(f)(iv) and any Distribution made as of the Withdrawal Date.  A withdrawing Member is not entitled to a portion of the Capital Reserve set to be distributed to the Members in a Distribution after the Withdrawal Date.

### 5.07(f)        Distributions on Expulsion

On Expulsion, any expelled Member is entitled to receive, within a reasonable time, the Fair Value of that Member's interest in the Company, determined pursuant by the procedure set forth in Article 4(f)(iv) as of the date of

expulsion. An expelled Member is not entitled to a portion of the Capital Reserve set to be distributed to the Members in a Distribution after the date of expulsion.

### 5.07(g)        Distributions on Sale or Transfer

If an event addressed in Article 4(f) or 4(d) occurs, the Member, or Member's estate is entitled to receive any distribution as of the Withdrawal Date or Purchase Date. The Member or Member's estate is not entitled to a portion of the Capital Reserve set to be distributed to the Members in a Distribution after the Withdrawal Date or the Purchase Date.

### 5.07(h)        Distributions to Non-member Ex-Spouse

If an event addressed in Article 4(e) occurs, the non-member ex-spouse is entitled to receive any distribution as of the date of delivery of the membership interest certificates to the Company. Non-member exspouse is not entitled to a portion of the Capital Reserve set to be distributed to the Members in a Distribution after the date of delivery of the membership interest certificates to the Company.

### 5.07(i)        Prohibited Distributions

Notwithstanding the provisions herein, the Company shall not make a distribution that would cause the Company's total liabilities to exceed the fair market value of its total assets as those terms are defined in Section 101.206 of the TBOC. A Member who receives a distribution from the Company in violation of this subarticle is required to promptly return the distribution to the Company if the Member had knowledge of the violation.

E.    Additional Provisions

1.    Interest Rate

The interest rate determined pursuant to this Paragraph will be equal to the lowest interest rate per annum by which no interest will be imputed to the recipient of this interest by reason of Section 483 of the Internal Revenue Code of 1986 and the Treasury Regulations under that section as amended from time to time. This determination will be made as of the date the payer of the interest first becomes obligated to pay interest on any obligation created pursuant to this Agreement.

2.    Voting

Any provision in the Agreement and its Amendments requiring a vote of the Members is hereby revised to require a simple an affirmative vote by the Majority in Interest of the Members to become effective. Majority in Interest of the members means the members whose aggregate Membership Units of the Company constitutes more than one-half of the aggregate Membership Units of all Members.

This amendment will not affect Section 4.03 of the First Amendments providing for a unanimous approval of the individual members for the Company to issue additional Membership Units.

3.    Conflict

In the event the terms of the First Amendments conflict with another provision in the Agreement, the terms and conditions of the First Amendments shall take precedent.

4.    Mangers

The members hereby consent to the appointment of the Managers listed in the Certificate of Formation as Managers, which manager shall remain as Mangers until such time that the Managers resign.

Adopted on the ___19___ day of ___November___ 2014.

APPROVED:

_____
Brian Johnson, Member

_____
Joel Kay, Member

_____
Brian Johnson, Manager

_____
Joel Kay, Manager

_____
Spouse

_____
Spouse

# EXHIBIT B

| Vendor | Pmt Method | Acct. No. | Amt Paid | Invoice Date | Paid by |
|---|---|---|---|---|---|
| Northland Communications | Amex | 1045 | $ 118.41 | 9/19/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 9/9/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 9/9/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/29/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 8/19/2019 | Arete |
| Stanford Dosimetry LLC | Amex | 2076 | $ 530.50 | 8/19/2019 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 312.00 | 8/19/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/16/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/16/2019 | Arete |
| Confirm Biosciences | Amex | 2076 | $ 590.00 | 8/16/2019 | Arete |
| Flatt Stationers, Inc. | Amex | 2076 | $ 32.20 | 8/9/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/5/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/2/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/2/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/2/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/25/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/22/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/22/2019 | Arete |
| L & M Wholesale Electronics | Amex | 2076 | $ 129.85 | 7/19/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 7/17/2019 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 7/15/2019 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 294.82 | 7/12/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/10/2019 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 360.75 | 7/10/2019 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 409.50 | 7/10/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/8/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/8/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/2/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/26/2019 | Arete |
| Walmart | Amex | 2076 | $ 35.22 | 6/26/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/20/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/20/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 6/18/2019 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 6/15/2019 | Arete |
| Confirm Biosciences | Amex | 2076 | $ 295.00 | 6/13/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/12/2019 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 269.74 | 6/12/2019 | Arete |
| Charlie Allens Burgers | Amex | 2076 | $ 22.49 | 6/11/2019 | Arete |
| USPS | Amex | 2076 | $ 6.85 | 6/10/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/7/2019 | Arete |
| BendTrailers.com | Amex | 2076 | $ 1,349.00 | 6/6/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/4/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 88.33 | 6/4/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/3/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/29/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/29/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/29/2019 | Arete |
| USPS | Amex | 2076 | $ 11.15 | 5/23/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/21/2019 | Arete |
| RXPads.com | Amex | 2076 | $ 46.95 | 5/19/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 5/17/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/16/2019 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 5/15/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/13/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/13/2019 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 342.30 | 5/12/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/2/2019 | Arete |

| Vendor | Pmt Method | Acct. No. | Amt Paid | Invoice Date | Paid by |
|---|---|---|---|---|---|
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/22/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/22/2019 | Arete |
| NAHP Online Store | Amex | 2076 | $ 65.00 | 4/22/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 4/19/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/19/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/19/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/19/2019 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 4/17/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/15/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/9/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/9/2019 | Arete |
| Home2 Suites by Hilton Waco | Amex | 2076 | $ 184.82 | 4/7/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 40.99 | 4/5/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/3/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/2/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/1/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 35.45 | 4/1/2019 | Arete |
| Confirm Biosciences | Amex | 2076 | $ 295.00 | 4/1/2019 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 494.00 | 3/31/2019 | Arete |
| Flatt Stationers, Inc. | Amex | 1052 | $ 34.41 | 3/25/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/25/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/21/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/21/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 3/19/2019 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 3/15/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/14/2019 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 271.64 | 3/12/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/7/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/7/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/7/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/7/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/7/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/4/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/4/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/4/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/4/2019 | Arete |
| Kohl's | Amex | 2076 | $ 50.00 | 3/1/2019 | Arete |
| Walmart | Amex | 2076 | $ 100.00 | 3/1/2019 | Arete |
|  | Amex | 2076 | $ 50.00 | 3/1/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/27/2019 | Arete |
| Fairfield by Marriott Waco North | Amex | 2076 | $ 8.94 | 2/23/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 16.99 | 2/20/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/19/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 164.29 | 2/19/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 2/19/2019 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 2/15/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 51.96 | 2/12/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 10.59 | 2/12/2019 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 341.35 | 2/12/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/11/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/11/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/11/2019 | Arete |
| Hampton Inn | Amex | 2076 | $ 103.60 | 2/10/2019 | Arete |
| Hampton Inn | Amex | 2076 | $ 100.60 | 2/5/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/4/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/4/2019 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 513.00 | 1/31/2019 | Arete |

| Vendor | Pmt Method | Acct. No. | Amt Paid | Invoice Date | Paid by |
|---|---|---|---|---|---|
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/30/2019 | Arete |
| FedEx Office | Amex | 2076 | $ 56.14 | 1/29/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 23.91 | 1/25/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 86.99 | 1/25/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/23/2019 | Arete |
| Mexia Medical Supply | Amex | 2076 | $ 40.79 | 1/21/2019 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 1/18/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/16/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/15/2019 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 1/15/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 67.71 | 1/14/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 35.45 | 1/14/2019 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 260.00 | 1/12/2019 | Arete |
| TxTag | Amex | 2076 | $ 10.98 | 1/11/2019 | Arete |
| Zaxby's | Amex | 2076 | $ 24.27 | 1/10/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 32.87 | 1/9/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/8/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/7/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 59.50 | 1/6/2019 | Arete |
| Amazon.com | Amex | 2076 | $ 35.25 | 1/6/2019 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/2/2019 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 446.50 | 12/31/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 9.23 | 12/27/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/26/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 60.50 | 12/23/2018 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 427.50 | 12/22/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 118.41 | 12/19/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/18/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 40.00 | 12/18/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 43.43 | 12/17/2018 | Arete |
| Ebay | Amex | 2076 | $ 100.00 | 12/17/2018 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 12/15/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 160.80 | 12/14/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/12/2018 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 246.92 | 12/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/10/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/10/2018 | Arete |
| Home2 Suites by Hilton Waco | Amex | 2076 | $ 382.48 | 12/9/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 25.87 | 11/30/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/29/2018 | Arete |
| Anatomy Warehouse | Amex | 2076 | $ 74.09 | 11/26/2018 | Arete |
| Brandi Garza | Amex | 2076 | $ 225.00 | 11/26/2018 | Arete |
| Comfort Inn & Suites | Amex | 2076 | $ 164.23 | 11/22/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/21/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/20/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/20/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 11/19/2018 | Arete |
| Hampton Inn | Amex | 2076 | $ 139.03 | 11/17/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/15/2018 | Arete |
| Flatt Stationers, Inc. | Amex | 1052 | $ 33.02 | 11/15/2018 | Arete |
| Comfort Inn & Suites | Amex | 2076 | $ 246.35 | 11/15/2018 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 11/15/2018 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 308.83 | 11/12/2018 | Arete |
| Comfort Inn & Suites | Amex | 2076 | $ 246.35 | 11/8/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/6/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/5/2018 | Arete |

| Vendor | Pmt Method | Acct. No. | Amt Paid | Invoice Date | Paid by |
|---|---|---|---|---|---|
| Comfort Inn & Suites | Amex | 2076 | $ 164.23 | 11/2/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 10/31/2018 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 494.00 | 10/31/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 10/29/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 10/29/2018 | Arete |
| Pizza Hut | Amex | 2076 | $ 21.09 | 10/26/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 10/19/2018 | Arete |
| Bi-Stone Building Supply Co. | Amex | 2076 | $ 37.44 | 10/19/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 10/18/2018 | Arete |
| Sam's Club | Amex | 2076 | $ 503.36 | 10/16/2018 | Arete |
| JGI Outdoor Advertising | Amex | 2076 | $ 308.67 | 10/15/2018 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 198.10 | 10/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 10/5/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 10/5/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 10/5/2018 | Arete |
| RXPads.com | Amex | 2076 | $ 58.45 | 10/4/2018 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 54.00 | 9/30/2018 | Arete |
| FedEx Office | Amex | 2076 | $ 13.50 | 9/25/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 9/24/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 9/24/2018 | Arete |
| Flatt Stationers, Inc. | Amex | 1052 | $ 36.36 | 9/21/2018 | Arete |
| Hobby Lobby | Amex | 2076 | $ 26.02 | 9/19/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 9/18/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 9/17/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 9/17/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 246.42 | 9/16/2018 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 268.48 | 9/12/2018 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 351.50 | 9/11/2018 | Arete |
| Flatt Stationers, Inc. | Amex | 1052 | $ 33.02 | 9/5/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 9/4/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/30/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/30/2018 | Arete |
| Flatt Stationers, Inc. | Amex | 1052 | $ 31.93 | 8/23/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/23/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/21/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 8/17/2018 | Arete |
| Texas Medical Board | Amex | 2076 | $ 61.61 | 8/16/2018 | Arete |
| Texas Medical Board | Amex | 2076 | $ 61.61 | 8/16/2018 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 332.12 | 8/12/2018 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 126.90 | 8/11/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/9/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 8/9/2018 | Arete |
| Stanford Dosimetry LLC | Amex | 2076 | $ 558.00 | 8/8/2018 | Arete |
| BSR Cable Park | Amex | 2076 | $ 128.10 | 8/5/2018 | Arete |
| HEB | Amex | 2076 | $ 68.13 | 8/5/2018 | Arete |
| Jim's Fried Krispy Chicken | Amex | 2076 | $ 28.61 | 8/5/2018 | Arete |
| HEB | Amex | 2076 | $ 62.97 | 8/4/2018 | Arete |
| Twin Liquors | Amex | 2076 | $ 71.45 | 8/4/2018 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 342.00 | 7/31/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/26/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/26/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 132.68 | 7/24/2018 | Arete |
| Farm House Restaurant | Amex | 2076 | $ 29.89 | 7/21/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 7/18/2018 | Arete |
| BSR Cable Park | Amex | 2076 | $ 693.88 | 7/17/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/13/2018 | Arete |
| Home2 Suites by Hilton Waco | Amex | 2076 | $ 190.46 | 7/10/2018 | Arete |

| Vendor | Pmt Method | Acct. No. | Amt Paid | Invoice Date | Paid by |
|---|---|---|---|---|---|
| Home2 Suites by Hilton Waco | Amex | 2076 | $ 190.46 | 7/10/2018 | Arete |
| Bubba's 33 | Amex | 2076 | $ 45.97 | 7/9/2018 | Arete |
| ITSC | Amex | 2076 | $ 1,688.70 | 7/9/2018 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 250.00 | 7/6/2018 | Arete |
| Teleradiology Specialists LLC | Amex | 2076 | $ 9.50 | 7/6/2018 | Arete |
| Farm House Restaurant | Amex | 2076 | $ 16.94 | 7/3/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/2/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/2/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 7/2/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/20/2018 | Arete |
| Aramark Uniform Service | Amex | 2076 | $ 165.85 | 6/19/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 6/18/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/15/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/15/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 97.68 | 6/14/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 97.68 | 6/14/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/13/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/13/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/13/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 6/13/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 97.68 | 6/2/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 97.68 | 6/2/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/31/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/18/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/17/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/11/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/11/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 5/9/2018 | Arete |
| NAHP Online Store | Amex | 2076 | $ 55.00 | 5/9/2018 | Arete |
| Charlie Allens Burgers | Amex | 2076 | $ 21.50 | 5/4/2018 | Arete |
| Matheson | Amex | 2076 | $ 37.70 | 5/4/2018 | Arete |
| Aramark Uniform Service | Amex | 1052 | $ 850.46 | 5/3/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/30/2018 | Arete |
| Facebook Ads | Amex | 2076 | $ 19.99 | 4/30/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/26/2018 | Arete |
| Farm House Restaurant | Amex | 2076 | $ 48.87 | 4/20/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/19/2018 | Arete |
| Hilton Waco | Amex | 2076 | $ 439.54 | 4/19/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.50 | 4/18/2018 | Arete |
| FedEx Office | Amex | 2076 | $ 28.79 | 4/17/2018 | Arete |
| Office Depot | Amex | 2076 | $ 27.05 | 4/16/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 40.58 | 4/14/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 4/12/2018 | Arete |
| FedEx Office | Amex | 2076 | $ 383.48 | 4/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/29/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/27/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 122.68 | 3/26/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 22.82 | 3/26/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 21.00 | 3/26/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 32.91 | 3/26/2018 | Arete |
| Walmart | Amex | 2076 | $ 44.22 | 3/25/2018 | Arete |
| TxTag | Amex | 2076 | $ 40.47 | 3/25/2018 | Arete |
| TxTag | Amex | 2076 | $ 14.07 | 3/25/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 69.99 | 3/23/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 3/19/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/19/2018 | Arete |

| Vendor | Pmt Method | Acct. No. | Amt Paid | Invoice Date | Paid by |
|---|---|---|---|---|---|
| Flatt Stationers, Inc. | Amex | 1052 | $ 5.95 | 3/16/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/16/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 96.60 | 3/16/2018 | Arete |
| Aramark Uniform Service | Amex | 1052 | $ 107.98 | 3/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/8/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 3/1/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 344.71 | 2/27/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/23/2018 | Arete |
| JGI Outdoor Advertising | Amex | 1052 | $ 308.67 | 2/21/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 2/20/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/19/2018 | Arete |
| Facebook Ads | Amex | 2076 | $ 7.87 | 2/17/2018 | Arete |
| Facebook Ads | Amex | 2076 | $ 42.13 | 2/17/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 95.54 | 2/16/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 95.54 | 2/16/2018 | Arete |
| Smoothie King | Amex | 2076 | $ 15.67 | 2/16/2018 | Arete |
| FedEx Office | Amex | 2076 | $ 593.83 | 2/15/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 13.60 | 2/14/2018 | Arete |
| FedEx Office | Amex | 2076 | $ 22.52 | 2/14/2018 | Arete |
| Halo Branded Solutions | Amex | 2076 | $ 212.81 | 2/13/2018 | Arete |
| Halo Branded Solutions | Amex | 2076 | $ 321.19 | 2/13/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/12/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/12/2018 | Arete |
| Facebook Ads | Amex | 2076 | $ 14.00 | 2/9/2018 | Arete |
| Facebook Ads | Amex | 2076 | $ 11.00 | 2/9/2018 | Arete |
| Halo Branded Solutions | Amex | 2076 | $ 728.74 | 2/8/2018 | Arete |
| Hobby Lobby | Amex | 2076 | $ 51.18 | 2/7/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 2/6/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 15.99 | 2/5/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 101.69 | 2/4/2018 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 101.69 | 2/3/2018 | Arete |
| Jim's Fried Krispy Chicken | Amex | 2076 | $ 40.04 | 2/1/2018 | Arete |
| Stanford Dosimetry LLC | Amex | 2076 | $ 100.50 | 2/1/2018 | Arete |
| Flatt Stationers, Inc. | Amex | 1052 | $ 31.93 | 1/31/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/31/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 256.15 | 1/31/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 170.32 | 1/31/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 85.30 | 1/31/2018 | Arete |
| Halo Branded Solutions | Amex | 2076 | $ 383.50 | 1/29/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/25/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 21.46 | 1/24/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/23/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 56.42 | 1/23/2018 | Arete |
| Halo Branded Solutions | Amex | 2076 | $ 788.67 | 1/22/2018 | Arete |
| Pizza Hut | Amex | 2076 | $ 42.73 | 1/19/2018 | Arete |
| Halo Branded Solutions | Amex | 2076 | $ 1,195.25 | 1/19/2018 | Arete |
| Northland Communications | Amex | 1045 | $ 112.15 | 1/18/2018 | Arete |
| Halo Branded Solutions | Amex | 2076 | $ 1,222.21 | 1/18/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/16/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/15/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/4/2018 | Arete |
| Mexia Medical Supply | Amex | 2076 | $ 108.25 | 1/4/2018 | Arete |
| The UPS Store | Amex | 2076 | $ 14.34 | 1/3/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/2/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 1/2/2018 | Arete |
| Amazon.com | Amex | 2076 | $ 26.87 | 1/2/2018 | Arete |

| Vendor | Pmt Method | Acct. No. | Amt Paid | Invoice Date | Paid by |
|--------|-----------|-----------|----------|--------------|---------|
| Amazon.com | Amex | 2076 | $ 68.14 | 1/2/2018 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/28/2017 | Arete |
| Hampton Inn | Amex | 2076 | $ 102.47 | 12/27/2017 | Arete |
| Hampton Inn | Amex | 2076 | $ 130.85 | 12/26/2017 | Arete |
| Peace.Love.Cookies | Amex | 2076 | $ 45.00 | 12/23/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/21/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/19/2017 | Arete |
| Amazon.com | Amex | 2076 | $ 98.41 | 12/19/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/13/2017 | Arete |
| Aramark Uniform Service | Amex | 1052 | $ 348.36 | 12/12/2017 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 102.70 | 12/10/2017 | Arete |
| Frankie's Pasta and Pizza | Amex | 2076 | $ 276.00 | 12/9/2017 | Arete |
| HEB | Amex | 2076 | $ 856.88 | 12/9/2017 | Arete |
| Walmart | Amex | 2076 | $ 156.58 | 12/9/2017 | Arete |
| Amazon.com | Amex | 2076 | $ 9.35 | 12/8/2017 | Arete |
| Amazon.com | Amex | 2076 | $ 422.72 | 12/8/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 12/6/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/30/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/29/2017 | Arete |
| Amazon.com | Amex | 2076 | $ 99.98 | 11/29/2017 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 193.20 | 11/25/2017 | Arete |
| Chick-Fil-A | Amex | 2076 | $ 70.90 | 11/22/2017 | Arete |
| Flatt Stationers, Inc. | Amex | 1052 | $ 9.41 | 11/21/2017 | Arete |
| JGI Outdoor Advertising | Amex | 1052 | $ 308.67 | 11/21/2017 | Arete |
| Jim's Fried Krispy Chicken | Amex | 2076 | $ 29.73 | 11/21/2017 | Arete |
| McDonald's | Amex | 2076 | $ 14.27 | 11/21/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/20/2017 | Arete |
| Amazon.com | Amex | 2076 | $ 157.28 | 11/20/2017 | Arete |
| Amazon.com | Amex | 2076 | $ 111.35 | 11/20/2017 | Arete |
| Coffee Cabaret | Amex | 2076 | $ 11.31 | 11/20/2017 | Arete |
| Jim's Fried Krispy Chicken | Amex | 2076 | $ 13.61 | 11/20/2017 | Arete |
| Whataburger | Amex | 2076 | $ 14.45 | 11/20/2017 | Arete |
| Northland Communications | Amex | 1045 | $ 105.13 | 11/17/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/17/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/15/2017 | Arete |
| Aramark Uniform Service | Amex | 1052 | $ 385.46 | 11/12/2017 | Arete |
| Charlie Allens Burgers | Amex | 2076 | $ 40.97 | 11/11/2017 | Arete |
| Farm House Restaurant | Amex | 2076 | $ 24.53 | 11/10/2017 | Arete |
| Amazon.com | Amex | 2076 | $ 34.69 | 11/8/2017 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 91.52 | 11/7/2017 | Arete |
| McKesson Medical-Surgical | Amex | 1052 | $ 484.17 | 11/6/2017 | Arete |
| Chili's Grill & Bar | Amex | 2076 | $ 41.05 | 11/6/2017 | Arete |
| Choice Hotels.com | Amex | 2076 | $ 183.04 | 11/6/2017 | Arete |

**CERTIFICATE OF SERVICE**

I, Jory Cook, hereby certify that I have served a true and correct copy of the foregoing *AMENDED COMPLAINT TO AVOID AND RECOVER TRANSFERS PURSUANT TO 11 U.S.C. §§544, 547, 550 AND TUFTA* with any and all exhibits or attachments by filing it with the Bankruptcy Court's electronic filing system pursuant to FRCP 5(b)(2)(E) and Local Rule 7005 upon the following parties:

**Dean William Greer**
dean@dwgreerlaw.com; deangreernotices@gmail.com; deangreernotices2@gmail.com

Respectfully submitted this 4th day of October 2021.

_____ *Jory Cook*
Jory D. Cook